UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

DAVID MICHAEL SCHWABLAND,

Defendant.

Case No. CR14-223RSL

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO EXCLUDE TESTIMONY

This matter comes before the Court on defendant's "Motion And Memorandum Of Law To Suppress Fruits Of Unlawful Search And Seizure," Dkt. # 26; and the government's "Motion In Limine To Exclude Testimony Of Defense Witness Steven Nicely," Dkt. # 43.  Having reviewed the memoranda and exhibits submitted by the parties, and having considered the evidence and argument presented at the February 2, 2015 hearing on these motions, the Court finds as follows.

## I. BACKGROUND[1]

On May 21, 2014, while on patrol in Monroe, Washington, Officer Nathan Erdmann of the Monroe Police Department observed a black Honda Civic enter a Burger King parking lot

---

[1] The facts stated herein are summarized from the police reports, search warrant affidavits, and officer testimony in this case.  Dkt. # 30-1 (Erdmann Reports); Dkt. # 30-2 (Kornish Reports); Dkt. # 30-3 (Affidavit for Search Warrant # 14-66); Dkt. # 52 (Hr'g Tr. Feb. 2, 2015).

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 1

and go through the drive-through, which he relayed to fellow Monroe Police Officer Scott Kornish.[2] This particular Burger King parking lot was a known meeting spot for drug transactions. Kornish identified the Honda as belonging to Ashley Schwabland; the officers had learned from multiple informants that Schwabland's husband, defendant David Schwabland ("defendant"), was actively selling methamphetamine and usually had a firearm in this vehicle. After running defendant through his dashboard computer, Kornish learned that defendant had a suspended driver's license. The officers could not identify the Honda's driver, but when Kornish saw the vehicle he determined that the driver was not defendant.

The officers followed the Honda to a nearby strip mall parking lot, where defendant exited an AT&T store, approached the vehicle and took over as the driver. The Honda drove to the nearby parking lot of O'Reilly's, passing Officer Kornish's vehicle; Kornish confirmed that defendant was now the driver. Kornish activated his lights and affected a traffic stop. Kornish asked why defendant was driving with a suspended license, to which defendant replied that he was just going to the store to get a spare part. After noticing a large fixed blade knife next to the center console, Kornish ordered defendant out of the car, advised him that he was under arrest, placed him in handcuffs and read him his <u>Miranda</u> rights.

Both officers recognized defendant's passenger as Zachary Hargin; Hargin was a known drug user whom Kornish had previously arrested for possession of drug paraphernalia (a meth pipe with residue). After verifying that there was an active and valid warrant out for Hargin's arrest, Erdmann placed Hargin under arrest; another officer arrived on the scene and took Hargin away.

Kornish searched defendant's wallet and found a large amount of cash (totaling $2,910). Kornish asked why defendant had so much money in his possession, given that (to Kornish's knowledge) defendant was jobless. Defendant explained that he sold antiques and was carrying

---

[2] The officers were watching this Burger King because they had just followed another vehicle to this location that they suspected was involved in drug-dealing activity. The government has not presented evidence of any interaction between this vehicle's occupants and the Honda's occupants.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 2

so much cash on his person because he did not trust banks.  Kornish also recovered a folded piece of paper from defendant's wallet, which upon inspection both officers recognized as a "product list" for a methamphetamine lab.  After initially denying that it was a list of ingredients for methamphetamine production, defendant explained that a friend of his with a drug problem had left the list in his car and that defendant was going to confront him with it.  Defendant's wallet also contained a business card for Eagle Self Storage in Woodinville, WA, and another card with an entry code written on it.  Defendant refused to consent to a search of the Honda.

Officer Erdmann deployed his narcotics detection dog, K-9 Lexi, on the vehicle.  Lexi exhibited a specific alert for the odor of narcotics.  Defendant was informed that he would be released, but that the Honda would be impounded while officers sought a search warrant for the vehicle.  Defendant was transported to his residence and released,[3] and the Honda was towed.

On May 22, 2014, Officer Kornish applied for and was granted a search warrant for the Honda.  The search revealed a concealed handgun (later found to be stolen), ammunition, approx. 1.6 grams of methamphetamine, a digital scale, and narcotics paraphernalia.  The search also uncovered a folder containing rental agreement paperwork for a storage unit at Eagle Self Storage.  The paperwork listed an Emily Shaffer as the renter, and named defendant as an alternate contact.[4]

On May 23, 2014, Officers Kornish and Erdmann went to Eagle Self Storage, where they spoke to an employee about the storage unit identified in the rental paperwork (Unit B136).  The officers asked whether either defendant or his wife was involved in renting the unit.  The employee informed the officers that her manager could look up that information; Erdmann gave the employee his business card, and the officers left.

Very shortly thereafter, the officers received a call from the employee informing them

---

[3] Defendant was put in the back of a police car at some point after he was searched.  The record indicates that Hargin was taken from the scene while defendant was still talking to the officers.

[4] The Honda was searched again pursuant to a different warrant on May 29, 2014, as were the phones recovered in the initial search of the Honda.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 3

that someone was in Unit B136.  The officers returned to the facility, where they learned that an individual had been dropped off.  After a short wait, the officers observed a Mazda M5 Minivan (which they recognized as belonging to the Schwablands) enter the complex and travel towards the building containing the unit, and soon after that found the minivan parked outside the building with Ashley Schwabland standing nearby.  After watching the vehicle for several minutes, the officers observed defendant emerge from the building carrying what the officers recognized as gun cases, which defendant loaded into the minivan.  Defendant made several trips to and from the building retrieving gun cases and what appeared to be a rifle wrapped in some type of covering, which defendant also placed in the minivan.

The officers followed the Mazda (being driven by Ashley Schwabland) after it left the building and soon after stopped the vehicle.  Officers subdued and arrested defendant after he resisted arrest and attempted to flee.  On May 24, 2014, Officer Erdmann applied for and was granted a search warrant for the Mazda and the storage unit.  These searches recovered multiple illegal firearms and a significant amount of ammunition.

Defendant was indicted on June 23, 2014 on two counts of being a felon in possession of a firearm.  On November 7, 2014, defendant filed the instant motion to suppress all fruits of the May 21 stop and the search of defendant's person; the officers' subsequent impoundment and search of the Honda; the officers' surveillance at Eagle Self Storage; and the arrest and searches that followed.  Dkt. # 26.  An evidentiary hearing was held on February 2, 2015, after which the parties filed supplemental briefing at the Court's instruction.  Dkt. # 53; Dkt. # 54.

## II.  DISCUSSION

### A.    Initial Stop of Defendant's Honda

Defendant relies on State v. Day, 96 Wn.2d 646 (1981), to argue that defendant should not have been stopped for driving with a suspended license given that he was on private property at the time.  Dkt. # 33 (Def. Reply) at 2-3.  In Day, the Court held that defendant should not have been arrested for driving while intoxicated where he had been driving in circles on a field owned

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 4

by his parents, given that the statutory scheme surrounding Washington's DWI statute was not meant to apply to him. The court emphasized "the unique facts of the case," noting the following:

> [Defendant] was not on or near a public road. He was never observed driving on a public road or driving on property where the public had a right to be . . . . He was posing no threat to the public. This is not a case where it is logical to assume he would leave the private property and pursue a course along a public roadway. The vehicle was unlicensed and he was not on or even near a public road. In addition, the land on which he was driving was privately owned and the public had no right to be there nor was the public expected to be on the property. His arrest did not further the purpose of the statute in any way.

96 Wn.2d at 647, 649-50. Importantly, this case did not set out a bright-line rule that one could not be arrested for drunk driving on private property. As the Washington Court of Appeals later noted:

> While the [Day] court could have ruled "elsewhere throughout the state" [wording from the relevant state statute] did not apply to offenses committed on private property, it chose to limit its decision to the unique facts of the case and apply the statute only to drunk drivers that pose a threat to the public.

City of Edmonds v. Ostby, 48 Wn. App. 867, 870 (1987). In the instant case, defendant was driving through commercial stores' parking lots, near to public roads and where the public had the right to be. Defendant therefore posed a potential risk to the driving public that the defendant in Day did not, and it is hard to see how stopping him did not further public safety. The stop was a proper enforcement of state law.

### B.      Whether Defendant Was Under Custodial Arrest When Searched

Defendant argues that Officer Kornish's warrantless search of his person and his wallet was unlawful. Under the doctrine of "search incident to arrest," an officer may search a suspect he places under lawful custodial arrest on the grounds that the arrestee may be carrying a weapon or destructible evidence. See United States v. Robinson, 414 U.S. 218, 234-35 (1973). Defendant argues that this doctrine did not justify Kornish's search because defendant was never subjected to a full custodial arrest for driving with a suspended license. Dkt. # 33 at 6-7. Defendant argues that he was not significantly restrained at the time of the search, noting that he

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 5

was searched prior to being put in a patrol car and after Hargin had been put in a patrol car. Id.[5] Defendant further emphasizes that the Monroe Police Department does not book people into jail for driving with suspended licenses, and suggests that Officer Kornish had no intention of doing so. Dkt. # 53 at 4. In his testimony, Kornish confirmed that he would not generally book or jail misdemeanor offenders, Dkt. # 52 (Tr. 53:3-54:22); and indicated that at the time of defendant's apprehension officers were discouraged from taking people into custody for driving with suspended licenses, see id. (discouraging this practice has since become official policy).[6] Driving with a suspended license is legally an arrestable offense, see RCW 46.20.342 (driving with a suspended license is a misdemeanor), RCW 10.31.100 (officers may arrest for misdemeanors committed in their presence); the Court finds that Kornish had probable cause to arrest defendant for this crime.

The Court finds that defendant was under custodial arrest such that he could be searched incident to arrest. In United States v. Mota, 982 F.2d 1384, 1386-87 (9th Cir. 1993), the court held that defendants "clearly had been taken into custody" (such that they could be searched incident to their arrests) when they were handcuffed and notified that they were under arrest prior to being searched, because "a reasonable person" in their position "would have undoubtedly felt that he was under arrest." The court did not identify defendants' subsequent transportation for booking as a factor in whether defendants were placed into custody. The Mota court's focus on what a reasonable person would conclude about his freedom to leave a police encounter is consistent with how "custody" has been defined in various contexts. See United States v. Bassignani, 575 F.3d 879, 883 (9th Cir. 2009) (underlying question in whether

---

[5] The Court finds the record unclear about whether Hargin was put in a patrol car immediately before or after defendant was searched; however, this does not affect the Court's analysis or its ruling.

[6] Defendant suggests as part of his argument that an officer may not use an arrest for a traffic violation as a pretext to look for evidence of other crimes, even if he has probable cause to affect the arrest. This is incorrect. The Ninth Circuit in United States v. Hudson, 100 F.3d 1409, 1415-16 (9th Cir. 1996) held that an arresting officer's subjective intention to search for evidence of an unrelated offense is immaterial to whether the arrest is lawful (and an attendant search is valid), so long as the officer has probable cause to affect the arrest. This leaves the issue of whether defendant was actually under custodial arrest at the time that he was searched.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 6

defendant is "in custody" for <u>Miranda</u> purposes is whether he would feel free to leave).  It is also consistent with the principle that a stop ripens into an arrest where a reasonable person in the defendant's position would conclude, based on the totality of the circumstances, that he would not be free to leave after brief questioning (and that "indefinite custodial detention" was "inevitable").  <u>See</u> <u>United States v. Guzman-Padilla</u>, 573 F.3d 865, 886 (9th Cir. 2009).

Defendant relies on <u>United States v. Parr</u>, 843 F.2d 1228 (9th Cir. 1988), which suppressed evidence seized from a defendant who was stopped on suspicion of driving with a suspended license.  Much like in this case, the court found that the officer involved had probable cause to believe that defendant was "driving while suspended" and had the discretionary authority to arrest him.  <u>Id.</u> at 1229-30.  Nevertheless, the Court found that this defendant was not subjected to the "custodial arrest" necessary to support a search incident to arrest, where this defendant was placed in the back of a patrol car for several minutes before being released with a citation (for driving with a suspended license and for unlawful possession of a firearm).  <u>Id.</u>  In support of this ruling, <u>Parr</u> held that "a distinction between investigatory stops and arrests may be drawn at the point of transporting the defendant to the police station," and noted that highly-intrusive measures such as handcuffing suspects had in previous cases been found not to create an arrest.  <u>Id.</u> at 1231.  However, the <u>Parr</u> court did not hold that transporting a defendant was prerequisite for a custodial arrest, and instead emphasized that defendant was not sufficiently restrained for him to have been "in custody."  <u>Id.</u>  The Court finds <u>Mota</u> more applicable here, where defendant was handcuffed and expressly informed that he was under arrest prior to the search.  Under the circumstances, a reasonable person in defendant's position would not have expected to be imminently released.

Defendant relies heavily on Supreme Court cases that indicate that the "officer safety" rationale for permitting a search of an arrestee's person is tied to the prospect of an officer having prolonged contact with this arrestee while transporting him.  In <u>Robinson</u>, 414 U.S. at 234-35, the Court held that searches incident to lawful arrests were justified because custodial

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 7

arrests presented dangers to officer safety, due to "the extended exposure which follows the taking of a suspect into custody and transporting him to the police station."[7]  In Knowles, 525 U.S. at 116-19, the Court held that officers could not automatically search suspects incident to issuing traffic citations where the officers chose to forego arresting these suspects, because such officers did not generally face the same dangers as officers who affected custodial arrests and transported suspects.

However, the Court does not read either Knowles or Robinson as setting a bright-line rule that a stop (supported by probable cause to arrest) must actually culminate in a suspect's transportation for a custodial arrest, justifying a search, to be found.  Such a finding would contradict post-Robinson statements from the Supreme Court concerning what it means to be arrested.  See Illinois v. Lafayette, 462 U.S. 640, 645 (1983) ("An arrested person is not invariably taken to a police station or confined; if an arrestee is taken to the police station, that is no more than a continuation of the custody inherent in the arrest status.") (distinguishing searches incident to arrest under Robinson from inventory searches).  This Court further notes that in Knowles it was undisputed that defendant had not been arrested, see 525 U.S. at 114; while in Robinson it was undisputed that defendant had been arrested, see 414 U.S. at 221. Thus, it is unsurprising that the cases provide incomplete guidance on when a custodial arrest has occurred.

This Circuit determines whether a stop is an arrest and a suspect is in custody by assessing what a reasonable person in the suspect's position would conclude, and it is clear that a suspect may be placed into custody prior to being transported.  See Mota, 982 F.2d at 1387.  It

---

[7] As the Court specifically stated:
> It is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical Terry-type stop.

414 U.S. at 234; See Knowles v. Iowa, 525 U.S. 113, 117 (1998) ("In Robinson, we stated that a custodial arrest involves 'danger to an officer' because of "the extended exposure which follows the taking of a suspect into custody and transporting him to the police station.").

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 8

follows that this suspect may be searched incident to his arrest because transporting him (the logical next step after arresting him) would endanger the officer.  This makes the search of a suspect's person valid at the time of the arrest.  An officer's subsequent release of a lawfully-arrested suspect does not negate the arrest or invalidate the search.  Defendant was placed under custodial arrest when Officer Kornish handcuffed him and told him that he was under arrest for driving with a suspended license, and accordingly defendant's person could be searched.

### C.      Search of Defendant's Wallet

Defendant suggests that Officer Kornish should not have searched defendant's wallet because the wallet could not have contained a weapon or evidence of the arresting offense.  Dkt. # 33 at 7.  As a bright-line rule, officers may search containers on an arrestee's person.  In Robinson, 414 U.S. at 220, incident to arresting defendant for driving with a revoked license, the arresting officer opened a cigarette pack on defendant's person and found heroin inside.  The Supreme Court held that this search was valid, rejecting the D.C. Circuit's ruling that the cigarette pack should not have been searched because it was unlikely to contain evidence of the arresting offense.  Id. at 235-36.  Just as it was unlikely for that cigarette pack to contain a weapon or destructible evidence related to the arresting offense, Schwabland's wallet was unlikely to contain such items.  The Ninth Circuit, relying on Robinson, has upheld searches of wallets under similar circumstances.  United States v. Passaro, 624 F.2d 938, 943 (9th Cir. 1980) (upholding search of wallet incident to defendant's arrest for assault and battery of police officers who stopped him for a speeding violation).  Kornish's search of Schwabland's wallet was proper if Robinson remains good law.

No Supreme Court case since Robinson has rolled back its bright-line rule permitting the search of any container on an arrestee's person.  In Riley v. California, 134 S. Ct. 2473, 2483-85 (2014), the Court analyzed Robinson and its rejection of the D.C. Circuit's reasoning, and neither overruled Robinson nor cited any subsequent authority doing so; the Riley Court merely refused to extend Robinson to permit officers to automatically search arrestees' cell phone data.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 9

Robinson clearly remains good law.[8]  The Court finds that both a lawful custodial arrest and a lawful search of the wallet occurred in this case.

### D.    Reliability of Dog Alert

Defendant argues that K-9 Lexi is too unreliable for her alerts to provide (or help provide) probable cause to impound (and later search) defendant's Honda.  In its briefing, defendant emphasized that Lexi (a) cannot communicate whether a substance she detects is present as residue or in measurable amounts, and (b) cannot communicate exactly what drug she has detected.  Dkt. # 26 at 12.  Defendant argued that the government's failure to include these facts in its first search warrant application for the Honda entitled defendant to an evidentiary hearing under Franks v. Delaware, 438 U.S. 154 (1978).  At the February 2, 2015 hearing, defendant attacked the quality of Lexi's training; defendant also argued that Lexi's records and training logs (kept by Officer Erdmann, her handler) were inadequate and insufficient to establish the dog's reliability.  The government moves to exclude the testimony of defendant's canine expert, Steven Nicely, on the grounds that his testimony has been rejected in multiple cases and that his methodology is unsound.  Dkt. # 43.[9]

While the Court finds Nicely's testimony admissible, the Court does not find Lexi unreliable.  In his report, which was informed by his review of Lexi's records, Nicely estimated that Lexi's "false error rate" ranged from 25%-35%.  Dkt. # 43-1 (Nicely Report) at 1, 13.  During the February 2, 2015 hearing, however, for unclear reasons (including miscalculation on his part), Nicely revised his report, and concluded that Lexi's false positive rate was

---

[8] While Arizona v. Gant, 556 U.S. 332 (2009), cited in defendant's supplemental brief, more recently revised the rules for searching vehicles incident to drivers' arrests, the case is inapposite, here.  See United States v. Gordon, 895 F. Supp. 2d 1011, 1023 (D. Haw. 2012) (Gant did not analyze a search of an arrestee's person and thus has no bearing on whether an arrestee's wallet may be searched).

[9] Lexi's reliability is at issue in this case, not her use.  Given that defendant was lawfully under arrest, the Court does not find that Lexi's use unnecessarily delayed the stop such that it would run afoul of Rodriguez v. United States, __ S.Ct. __, __L.Ed.2d.__, 2015 WL 1780927 (Apr. 21, 2015).  Furthermore, dog sniffs of vehicles are not searches in the Fourth Amendment sense, United States v. Jensen, 425 F.3d 698, 706 n. 2 (9th Cir. 2005).

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 10

approximately 10%. This appears to be a more than acceptable margin of error. See United States v. Limares, 269 F.3d 794, 798 (7th Cir. 2001) (dog sufficiently reliable for alert to support probable cause even if she only "has been right 62% of the time" as to the presence of drugs).[10]

The Court weighs the totality of the evidence in assessing a dog's reliability. See Harris, 133 S.Ct. at 1056-58. The Court finds that Lexi's training, certifications and performance are more than sufficient to establish the reliability of her alerts. Lexi's alert on defendant's Honda supported impounding the vehicle and was properly included in the officers' search warrant applications.[11]

### E.    Impoundment of Defendant's Honda

Defendant argues that the government must establish that there was probable cause to impound defendant's Honda while officers sought a search warrant for it. Impounding a vehicle is proper under the Fourth Amendment where officers have probable cause to believe the vehicle contains illegal drugs. United States v. Jensen, 425 F.3d 698, 706 (9th Cir. 2005) (upholding impoundment of car in part because dog alerted to the presence of narcotics therein). Probable cause to conduct a search[12] is found to exist if, under the totality of the circumstances, there is a

---

[10] Defendant's argument that Lexi's hypersensitivity undermines her reliability is also not well-taken. The Supreme Court recently suggested that such arguments are generally unpersuasive:

> A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone (just as a police officer's much inferior nose detects the odor of marijuana for some time after a joint has been smoked). In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability – all that is required for probable cause – that either drugs or evidence of a drug crime (like the precursor chemicals in [defendant's] truck) will be found.

Florida v. Harris, 133 S. Ct. 1050, 1057 n. 2 (2013).

[11] The Court does not find that Lexi's inability to communicate whether she detects marijuana or another drug renders her alerts unreliable to support probable cause, nor does the Court find that this had to be specifically communicated in the officers' warrant applications. The Court finds that defendant cannot show that the challenged search warrant contained any material omission (for Franks purposes) concerning Lexi's reliability.

[12] Jensen suggests that this is the relevant test for whether probable cause supports an automobile impoundment, see id. (citing United States v. Ibarra, 345 F.3d 711, 716 (9th Cir. 2003) (finding there was probable cause to search the inside of a car under the "automobile exception" to the Fourth Amendment's warrant requirement)).

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 11

fair probability that contraband or other evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238-39 (1983). In the instant case, a car belonging to the wife of a known drug dealer transported a known drug user to a known meeting spot for drug transactions, and then stopped nearby to pick up this known drug dealer (who was carrying a list of items for a methamphetamine lab along with a significant amount of cash), shortly before a reliable drug-sniffing dog alerted on this car. Put together, this established a fair probability that there was contraband in the vehicle, and thus there was probable cause to impound the Honda.

### F.      Evidence Stemming From Discovery of Rental Paperwork

Defendant notes that the only documents that the first search warrant for his Honda permitted officers to seize were "ledgers," and not the range of documents listed in the warrant affidavit. Dkt. # 26 at 8-9. Thus, defendant argues, officers had no authority to seize the rental agreement paperwork for defendant's storage unit from the car. Id. Because officers unlawfully seized this paperwork, all evidence stemming from the lead that the paperwork gave them must be suppressed as "fruit of the poisonous tree;" this would include everything officers learned and observed at Eagle Self Storage. Id. The government counters that the search warrant affidavit (which was incorporated into the warrant by reference) clarified and narrowed the warrant's use of the broad term "ledgers," thereby authorizing the seizure of the paperwork in question. Dkt. # 30 at 9-10. In the alternative, the government argues that because officers had the authority to look at the paperwork to determine whether it constituted a "ledger," they were authorized to find and use the information on the face of the paperwork to further their investigation. Id. at 10-11.[13]

---

[13] On this same basis, defendant also moves to suppress all documents recovered from the government's second search of the Honda that fell outside the scope of the warrant authorizing this search. Dkt. # 26 at 10-11. Defendant argues that the only documents the second warrant authorized officers to seize were "ledgers," and notes that according to the government's records this search recovered "documents" (presumably not limited to ledgers). Id. The parties have not disclosed the nature of the recovered documents to the Court, and thus the Court can neither determine whether the government exceeded the scope of this warrant nor identify the documents to be suppressed. The Court declines to suppress any evidence from this second search of the Honda.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 12

### (a)    "Fruit of the Poisonous Tree" Doctrine

When illegal searches and seizures produce leads that "significantly direct" an investigation towards the discovery of certain evidence, that evidence is tainted and must be suppressed as "fruit of the poisonous tree," unless one of several exceptions applies.  See United States v. Smith, 155 F.3d 1051, 1061 (9th Cir. 1998); see also Wong Sun v. United States, 371 U.S. 471, 488 (1963) (evidence must be suppressed that was acquired through the government's "exploitation" of illegal activity).  Ninth Circuit precedent establishes that the fruits of police surveillance can be excluded under this doctrine where this surveillance stems from an illegal search or seizure.  United States v. Johns, 891 F.2d 243, 244-45 (9th Cir. 1989) (suppressing marijuana discovered through police surveillance of defendant's associates where this surveillance began as the direct result of government agents identifying defendant during an illegal stop).

The officers' discovery of the rental paperwork in defendant's vehicle (including the storage unit number) led them to investigate the unit and ultimately resulted in them finding defendant moving weapons.  Thus, the evidence obtained as a result of this discovery may be suppressed if the officers unlawfully obtained the information in the paperwork.

### (b)    Scope of Search Warrant and Use of Information from the Paperwork

Courts have held that properly-incorporated[14] affidavits can be used to clarify ambiguous terms of a search warrant.  United States v. Cerna, 2010 WL 3749449, at *14 (N.D. Cal. Sept. 22, 2010) (affidavit narrowed the term "photographs" in the warrant to photographs that could be evidence of a homicide or of gang activity).  However, Ninth Circuit precedent clearly holds that an affidavit cannot expand the scope of a legitimate warrant beyond its express limitations.  United States v. Sedaghaty, 728 F.3d 885, 913 (9th Cir. 2013).

---

[14] An affidavit is part of a search warrant if (1) the warrant expressly incorporates the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while officers execute the search.  United States v. SDI Future Health, Inc., 568 F.3d 684, 699 (9th Cir. 2009).  The former requirement was clearly met in this case, and the Court has no reason to believe that the latter was not.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 13

The only documents that the search warrant for the Honda expressly authorized officers to seize were "ledgers," while the warrant affidavit sought the seizure of multiple types of documents (listing ledgers and rental records for commercial storage spaces as separate items).[15] However, Officer Kornish testified that he drafted both the search warrant affidavit and the warrant itself, both of which the authorizing judge signed without revision. Dkt. # 52 (Tr. 64:23-65:12). It follows that the authorizing judge did not intend to narrow the range of items to be seized in signing the warrant, and that the affidavit logically expands on the warrant's meaning without expanding its scope. Thus, officers could lawfully seize this paperwork and use it to further their investigation because the judge signed the warrant (broadly authorizing the seizure of "ledgers") and incorporated the affidavit by reference, allowing the latter to expand on what "ledgers" included.

### III. CONCLUSION

For all of the foregoing reasons, the Court DENIES defendant's motion to suppress evidence, Dkt. # 26; and DENIES the government's motion to exclude testimony, Dkt. # 43.

DATED this 29th day of April, 2015.

MM S Lasnik
Robert S. Lasnik
United States District Judge

---

[15] The affidavit sought the following items:
> Records indicating the distribution of illicit narcotics including books, documents and **ledgers** and pay/owe sheets, notes indicating amounts of weight or currency, documents and/or books reflecting the names, addresses, phone numbers or other information pertaining to sources of supply, customers or co-conspirators in the distribution of controlled substances and the transportation, ordering, purchase, possession and distribution of controlled substances . . . Records indicating the rental of Post Office boxes, Safety Deposit boxes, **other residential or commercial spaces and storage lockers, including rental and lease agreements and access codes and keys**[.]

Dkt. # 30-3 at 3-4 (emphasis added).

ORDER DENYING MOTION TO SUPPRESS EVIDENCE
AND MOTION TO EXCLUDE TESTIMONY - 14